### IN THE UNITED STATES DISTRICT COURT
### FOR THE WESTERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| RUBY J. DISNEY, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v.                                                ) | Case No. CIV-19-00946-PRW |
| ) | |
| UNITED NATIONAL LIFE INSURANCE ) | |
| COMPANY OF AMERICA, ) | |
| ) | |
| Defendant. ) | |

### MEMORANDUM OPINION AND ORDER

A man obtained cancer insurance for him and his wife. Several years later, the man died, survived by his wife and their insurance policy. Soon after, the widow was diagnosed with cancer and sought the benefits of her coverage under the insurance policy, but the insurer denied her claim. In the insurer's view, her coverage automatically terminated thirty-one days after the death of her husband. The widow then brought this action for breach of contract and bad faith against the insurer. Now, the defendant-insurer moves for summary judgment on all claims. For the reasons set forth below, the Court DENIES Defendant's Motion for Summary Judgment (Dkt. 16).

### *Background*

I. *Undisputed Facts*

   a. *The Insurance Policy and The Rider*

The material, undisputed facts are as follows. On May 17, 2011, Mr. Billy J. Disney and Defendant, United National Life Insurance Company of America, entered into two

1

related agreements.[1] The first agreement was a "First Diagnosis Cancer Benefit Policy" (the "Policy"), an insurance agreement covering certain cancer-related services, treatments, and procedures.[2] The second agreement was a "Return of Premium Benefit Rider" (the "Rider"), a supplemental agreement providing for the return of insurance premiums paid under certain conditions in exchange for an additional monthly premium.[3] In effect, this supplemental agreement insured against the possibility that the insured would pay premiums over an extended period of time without benefitting from the insurance.[4]

The Policy and the Rider, by incorporation, define certain contractual terms.[5] Mr. Disney was the "Insured," "mean[ing] the person named in the Policy and Policy Schedule," and, as the "Insured," was the "You, Your, and Yours" referred to in both the Policy and the Rider.[6] Mrs. Ruby J. Disney, as Mr. Disney's spouse, was a "Dependent" and therefore a "Covered Person," entitling her to coverage under the Policy.[7] Further, and critically for present purposes, as a "covered spouse," Mrs. Disney was vested with the authority to decide to continue the Policy and the Rider upon Mr. Disney's death.[8]

---

[1] *See* Policy (Dkt. 16, Ex. 1).

[2] *See id.* at 8–28.

[3] *See id.* at 29–30.

[4] *See id.* at 29.

[5] *See id.* at 12–15, 30.

[6] *Id.* at 14–15, 17–20, 30.

[7] *Id.* at 10, 12.

[8] *See id.* at 16, 30.

The instant dispute turns on whether Mrs. Disney properly exercised her discretion to continue her coverage under the Policy and the Rider upon the death of her husband. On that score, three contractual provisions are key. The pertinent provision from the Policy reads:

### CONTINUATION OF INSURANCE

> If You die, Your covered spouse, if any, will become the Insured. The spouse may continue coverage for all Covered Persons under this Policy. A written request for continuation of coverage for all Covered Persons and the appropriate premium must be received by Us within thirty-one (31) days after Your death. We will terminate this Policy if the written request for continuation and the appropriate premium is not received by Us within thirty-one (31) days after Your death.[9]

The pertinent provisions from the Rider, meanwhile, provide:

### CONTINUATION PRIVILEGE

> If this is family coverage and You die, Your covered spouse may elect to continue coverage under the Policy and this Rider by paying the premium. [. . .][10]

### CONDITIONS

> This Rider is subject to all terms, provisions, limitations and exclusions of the Policy except where specifically changed by this Rider.[11]

---

[9] *Id.* at 16.

[10] *Id.* at 30.

[11] *Id.*

b. *Mr. Disney's Death and Mrs. Disney's Subsequent Cancer Diagnosis and Treatment, and Her Ensuing Insurance Claim*

Mr. Disney died on August 2, 2018.[12] Just three months later, on November 13, 2018, Mrs. Disney was diagnosed with cancer.[13] So, on November 27, 2018, Mrs. Disney called Defendant to claim the benefits of her coverage under the Policy.[14] During that call, Mrs. Disney informed Defendant of her cancer diagnosis and upcoming surgery and, incidentally, of her husband's death.[15] In response, the agent instructed her to submit her pathology report to proceed with her claim and to submit, "whenever [she was] able to," a death certificate for her late husband so she would become "the primary on the policy."[16] Mrs. Disney submitted these documents on or before December 4, 2018.[17]

On December 8, 2018, Defendant sent Mrs. Disney a letter and a check for $513.85.[18] The letter read, in its entirety, as follows:

> We were sorry to learn of the passing of Billy J. Disney. Please accept our condolences during this difficult time.
>
> Enclosed is a check representing a refund of the unearned premium due on this policy.

---

[12] *See* Def.'s Mot. for Summ. J. and Br. in Supp. (Dkt. 16) at 3; Pl.'s Br. in Opp'n to Def.'s Mot. for Summ. J. (Dkt. 29) at 10.

[13] December 2018 Submission (Dkt. 16, Ex. 2) at 4–6.

[14] *See* Tr. of First Call (Dkt. 29, Ex. 2).

[15] *See id.* at 4–5.

[16] *Id.* at 6, 10.

[17] *See* Def.'s Mot. for Summ. J. and Br. in Supp. (Dkt. 16) at 3; Pl.'s Br. in Opp'n to Def.'s Mot. for Summ. J. (Dkt. 29) at 17.

[18] *See* December 10, 2018 Letter (Dkt. 16, Ex. 3); Return of Unearned Premiums Check (Dkt. 16, Ex. 4).

> If you have any questions, please call our customer service department at 800-207-8050. Once again, we express our deepest sympathies to you and your family.[19]

The check, as the letter suggests, was a return of past premium payments which, to that point, had been automatically drawn from Mrs. Disney's account each month, including for each of the months following Mr. Disney's death.[20] In tandem with their letter and the refund check, Defendant cancelled their automatic withdrawal from Mrs. Disney's account.[21] Mrs. Disney cashed the check on December 20, 2018.[22]

On January 9, 2019, Defendant denied Mrs. Disney's claim, stating that "CHARGES INCURRED AFTER THE TERMINATION DATE [ARE] NOT COVERED."[23]

On or before January 11, 2019, Mrs. Disney called Defendant again, this time to ask "why [she] didn't have a payment t[aken] out of [her] bank th[at] month [or] last month . . . ."[24] Defendant informed Mrs. Disney that her automatic payments were stopped, and "th[e] policy terminated," "because [Mr. Disney] passed away."[25] Mrs. Disney informed Defendant that she had continued to pay for her coverage and never requested

---

[19] December 10, 2018 Letter (Dkt. 16, Ex. 3).

[20] *See* December 10, 2018 Letter (Dkt. 16, Ex. 3); Return of Unearned Premiums Check (Dkt. 16, Ex. 4); Accounting Records (Dkt. 29, Ex. 8).

[21] Dep. of Lesley Hanslope (Dkt. 29, Ex. 4) at 3.

[22] *See* Def.'s Mot. for Summ. J. and Br. in Supp. (Dkt. 16) at 3; Pl.'s Br. in Opp'n to Def.'s Mot. for Summ. J. (Dkt. 29) at 17.

[23] January 9, 2019 Explanation of Benefits (Dkt. 16, Ex. 5).

[24] Tr. of Second Call (Dkt. 29, Ex. 10) at 4.

[25] *Id.* at 5.

that it end.[26] She also explained that she cashed the check believing it was the part of the premium associated with her late husband's coverage, as nothing in the letter said anything to the contrary, and then offered to send that money back.[27] Defendant instructed Mrs. Disney to submit a letter appealing the denial of her claim and promised to follow up with her.[28] After that call, on the same day, Mrs. Disney submitted that letter.[29]

On January 14, 2019, Defendant received additional materials from Mrs. Disney, including statements for medical services provided between November 16, 2018 and December 4, 2018.[30]

On February 5, 2019, Defendant again denied Mrs. Disney's claim, repeating that "CHARGES INCURRED AFTER THE TERMINATION DATE [ARE] NOT COVERED."[31]

Mrs. Disney filed this action in the District Court in and for Oklahoma County on September 13, 2019, alleging breach of contract and bad faith.[32] Defendant removed to this Court on October 15, 2019.[33]

---

[26] *Id.* at 7–8.

[27] *Id.* at 8–9.

[28] *Id.* at 12–13.

[29] Pl.'s January 11, 2019 Letter (Dkt. 16, Ex. 6).

[30] Pl.'s January 14, 2019 Submission (Dkt. 16, Ex. 7).

[31] February 5, 2019 Explanation of Benefits (Dkt. 16, Ex. 8).

[32] *See* Pet. (Dkt. 1, Ex. 2).

[33] *See* Notice of Removal (Dkt. 1).

## *Legal Standard*

Federal Rule of Civil Procedure 56(a) requires "[t]he court [to] grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." In deciding whether summary judgment is proper, the court does not weigh the evidence and determine the truth of the matter asserted, but determines only whether there is a genuine dispute for trial before the fact-finder.[34] The movant bears the initial burden of demonstrating the absence of a genuine, material dispute and an entitlement to judgment.[35] A fact is "material" if, under the substantive law, it is essential to the proper disposition of the claim.[36] A dispute is "genuine" if there is sufficient evidence on each side so that a rational trier of fact could resolve the issue either way.[37]

If the movant carries the initial burden, the nonmovant must then assert that a material fact is genuinely disputed and must support the assertion by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials"; by "showing that the materials cited [in the movant's motion] do not establish the absence . . . of a genuine

---

[34] *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *see also Birch v. Polaris Indus., Inc.*, 812 F.3d 1238, 1251 (10th Cir. 2015).

[35] *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

[36] *Anderson*, 477 U.S. at 248; *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 670 (10th Cir. 1998).

[37] *Anderson*, 477 U.S. at 248; *Adler*, 144 F.3d at 670.

dispute"; or by "showing . . . that an adverse party [i.e., the movant] cannot produce admissible evidence to support the fact."[38] The nonmovant does not meet its burden by "simply show[ing] there is some metaphysical doubt as to the material facts,"[39] or by theorizing a "plausible scenario" in support of its claims.[40] "Rather, 'the relevant inquiry is whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.'"[41] If there is a genuine dispute as to some material fact, the district court must consider the evidence and all reasonable inferences from the evidence in the light most favorable to the nonmoving party.[42]

*Analysis*

I.  *Breach of Contract Claim*

To recover for breach of contract, Plaintiff must establish, among other things, that a contract was formed.[43] Defendant argues that the Court must grant summary judgment in its favor on the breach of contract claim because, according to the undisputed facts, there

---

[38] Fed. R. Civ. P. 56(c)(1); *see also Celotex Corp.*, 477 U.S. at 322; *Beard v. Banks*, 548 U.S. 521, 529 (2006).

[39] *Neustrom v. Union Pac. R.R. Co.*, 156 F.3d 1057, 1066 (10th Cir. 1998) (alteration in original) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986); *Ulissey v. Shvartsman*, 61 F.3d 805, 808 (10th Cir. 1995)).

[40] *Scott v. Harris*, 550 U.S. 372, 380 (2007).

[41] *Neustrom*, 156 F.3d at 1066 (quoting *Anderson*, 477 U.S. at 251–52; *Bingaman v. Kan. City Power & Light Co.*, 1 F.3d 976, 980 (10th Cir. 1993)).

[42] *Scott*, 550 U.S. at 380; *Matsushita Elec. Indus. Co.*, 475 U.S. at 587; *Sylvia v. Wisler*, 875 F.3d 1307, 1328 (10th Cir. 2017).

[43] *See Cates v. Integris Health, Inc.*, 2018 OK 9, ¶ 11, 412 P.3d 98, 103.

was no contract between Plaintiff and Defendant. Specifically, Defendant argues that, according to the language of the Policy, to continue coverage after Mr. Disney's death, Mrs. Disney was required to both submit a written request to continue coverage and pay the appropriate premium within thirty-one days. While Defendant concedes that it received payment within that timeframe, it points out that Mrs. Disney did not submit such a written request. Plaintiff argues, in response, that, according to the language of the Rider, all that was required to continue her coverage was payment of the appropriate premium. Because Mrs. Disney timely paid such premium, she continues, there was a contract. The Court agrees with Mrs. Disney that Defendants are not entitled to summary judgment on this issue.

The Court applies Oklahoma substantive law to this dispute.[44] Under Oklahoma law,

> [a]n insurance policy is a contract. The rules of construction and analysis applicable to contracts govern equally insurance policies. The primary goal of contract interpretation is to determine and give effect to the intention of the parties at the time the contract was made. In arriving at the parties' intent, the terms of the instrument are to be given their plain and ordinary meaning. Where the language of a contract is clear and unambiguous on its face, that which stands expressed within its four corners must be given effect. A contract should receive a construction that makes it reasonable, lawful, definite and capable of being carried into effect if it can be done without violating the intent of the parties.[45]

---

[44] *See Evanston Ins. Co. v. Law Office of Michael P. Medved, P.C.*, 890 F.3d 1195, 1198 (10th Cir. 2018); *see also State Farm Fire & Cas. Co. v. Pettigrew*, 180 F.Supp.3d 925, 931 (N.D. Okla. 2016) ("The interpretation of an insurance contract is governed by state law and, sitting in diversity, we look to the law of the forum state." (internal quotation marks and citation omitted)).

[45] *May v. Mid-Century Ins. Co.*, 2006 OK 100, ¶ 22, 151 P.3d 132, 140.

The language of the Policy and Rider, when read together, plainly require only that Mrs. Disney submit the appropriate premium to continue her coverage. While Defendant points out that the Policy requires Mrs. Disney to submit both "[a] written request for continuation of coverage" and "the appropriate premium" within thirty-one days of Mr. Disney's death to continue her coverage, the Policy cannot be read in isolation. The Parties entered into a supplemental agreement and that agreement expressly contemplates modification of the Policy: "Th[e] Rider is subject to all terms, provisions, limitations and exclusions of the Policy except *where specifically changed by th[e] Rider*."[46] And, indeed, the Rider specifically changed the conditions for continuation of coverage. Unlike the Policy, the Rider permits Mrs. Disney to "elect to continue coverage under the Policy and this Rider by paying the premium."[47] Therefore, if Mrs. Disney paid the appropriate premium, she continued her coverage.

Even if the Policy and the Rider were ambiguous, the Court would reach the same conclusion. "Insurance contracts are contracts of adhesion because of the uneven bargaining position of the parties. Consequently, in the event of ambiguity or conflict in the policy provisions, a policy of insurance is to be construed strictly against the insurer and in favor of the insured."[48]

If the Court sets aside the language in the Rider that "[t]h[e] Rider is subject to all terms, provisions, limitations and exclusions of the Policy except where specifically

---

[46] Policy (Dkt. 16, Ex. 1) at 30 (emphasis added).

[47] *Id.*

[48] *Spears v. Shelter Mut. Ins. Co.*, 2003 OK 66, ¶ 5, 73 P.3d 865, 868.

10

changed by th[e] Rider," the Policy and the Rider are in conflict: the Policy provides that, to continue coverage, Mrs. Disney must submit both "[a] written request for continuation of coverage" and "the appropriate premium" within thirty-one days of Mr. Disney's death; whereas the Rider provides Mrs. Disney need only "pay[] the premium" "to continue coverage under the Policy and this Rider." In light of the unequal bargaining power between Defendant and Plaintiff and this theoretical conflict in contract provisions, the Court construes the provisions for continuance in favor of Mrs. Disney. Therefore, the Court finds that to continue her coverage "under the Policy and th[e] Rider," Mrs. Disney needed only to "pay[] the premium." And because the facts arguably show that she made that payment, summary judgment on this claim is inappropriate.

## II.   Bad Faith Claim

Defendant also argues that the Court should grant summary judgment in its favor on Plaintiff's bad faith claim, for four reasons. First, Defendant argues that the contract automatically terminated thirty-one days after Mr. Disney's death because Mrs. Disney did not submit a written request for continued coverage. Therefore, Defendant continues, there can be no bad faith denial of her claim because its denial was legally correct. Second, Defendant asserts that, at a minimum, there was a legitimate dispute as to whether Mrs. Disney's claim was covered under the insurance policy, thereby precluding a claim for bad faith. Third, Defendant argues that "Plaintiff cannot offer evidence of any damages attributable" to Defendant because "the damages claimed by Plaintiff are attributable to her own failures to satisfy the Policy's clearly-stated requirements for continuance of insurance." Fourth, Defendant argues that its denial on the grounds that "the Policy had

11

terminated was reasonable as a matter of law." In short, Defendant argues that its conclusion that Mrs. Disney failed to continue her insurance coverage was correct and, if not correct, at least reasonable as a matter of law. The Court disagrees.

An insurer has an implied duty to deal fairly and act in good faith with its insured so as not to deprive the insured of the benefits of the policy.[49] "[T]he violation of this duty gives rise to an action in tort . . . ."[50] The essence of that tort is the unreasonable, bad faith conduct of the insurer.[51] The central issue, in other words, is whether Defendants "had a good faith belief in some justifiable reason for the actions it took or omitted to take that are claimed violative of the duty of good faith and fair dealing."[52] "[I]f there is conflicting evidence from which different inferences may be drawn regarding the reasonableness of insurer's conduct, then what is reasonable is always a question to be determined by the trier of fact by a consideration of the circumstances in each case."[53]

The Court finds that there is conflicting evidence as to the reasonableness of Defendant's denial of the claim and, therefore, this question should be submitted to the trier of fact, for three principle reasons. First, as a threshold matter, and as discussed earlier, Plaintiff potentially was covered by the Policy. Second, Defendant denied Plaintiff's claim on the basis of a plainly superseded provision of the contract, drawing into question the

---

[49] *See Christian v. Am. Home Assurance Co.*, 1977 OK 141, 577 P.2d 899, 904.

[50] *Id.*, 577 P.2d at 904.

[51] *Badillo v. Mid Century Ins. Co.*, 2005 OK 48, ¶ 28, 121 P.3d 1080, 1093.

[52] *Id.*, 121 P.3d at 1093–94.

[53] *Id.*, 121 P.3d at 1093 (quoting *McCorkle v. Great Atl. Ins. Co.*, 1981 OK 128, 637 P.2d 583, 587).

rationale put forth for, and by extension, the reasonableness of, that denial. Third, and relatedly, the evidence suggests that Defendant attempted to unilaterally terminate Plaintiff's coverage precisely because she sought to benefit from it. Put differently, there is reason to believe that if Plaintiff had not filed her claim, Defendant would not have attempted to terminate her coverage. These facts are sufficient to raise a question as to the reasonableness of the denial of the claim. As such, the bad faith claim must be submitted to the trier of fact.

### *Conclusion*

For the foregoing reasons, the Court **DENIES** Defendant's Motion for Summary Judgment (Dkt. 16).

**IT IS SO ORDERED** this 27th day of October, 2020.

_____
PATRICK R. WYRICK
UNITED STATES DISTRICT JUDGE